**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
**Case No. _____- Civ**



ROCHELLE KENTOV, Regional Director of the
Twelfth Region of the National Labor Relations Board,
for and on behalf of the NATIONAL LABOR
RELATIONS BOARD,

$$02-61716$$

                                        **Petitioner**

                v.

POINT BLANK BODY ARMOR, INC.                          **CIV-MARRA**
and NDL PRODUCTS, INC., a Single Employer,

                                        **Respondent**

                                                        **MAGISTRATE JUDGE**
-------------------------------------------------------------     **SELTZER**

**PETITIONER KENTOV'S MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF PETITION FOR INJUNCTION UNDER SECTION 10(j) OF THE ACT**

### I. STATEMENT OF THE CASE

This proceeding is before the Court on a petition for a temporary injunction pending the
final disposition of the matters involved herein now pending before the National Labor Relations
Board on a Consolidated Complaint (the complaint).

The complaint, which is based upon charges filed by Union of Needletrades, Industrial
and Textile Employees (UNITE!), AFL-CIO/CLC (the Union or UNITE), alleges that Point Blank
Body Armor, Inc. and NDL Products, Inc. (Respondent) have violated Section 8(a)(1) and (3) of
the Act [29 U.S.C. Sec. 158(a)(1) and (3)].

The petition herein is predicated on the Petitioner's conclusion that there is reasonable
cause to believe that Respondent has engaged in the unfair labor practices alleged in the
complaint, and that an injunction is just and proper.

### II.      BACKGROUND FACTS

#### A. Respondent's Operations

Respondent operates a factory in Oakland Park, Florida and is engaged in the
production and sale of body armor (bullet proof vests) and related accessories.  Respondent's
customers are primarily federal governmental entities, state and local police departments, and
correctional companies.

## B.  Filing of Petition for Union Representation

On July 15, 2002[1], the Union filed a representation petition, which it amended at a representation hearing, seeking an election to become the collective-bargaining representative of a unit of employees comprised of production, maintenance, shipping, receiving and warehouse employees at Respondent's facility in Oakland Park, Florida.

On September 3, a Decision and Direction of Election in Case 25-RC-10133 (12-RC-8814) issued finding, in essence, that the petitioned-for unit of employees, as amended, was an appropriate one and that Point Blank Body Armor, Inc. and NDL Products, Inc. are a single employer.[2]  Approximately 420 employees are eligible to vote; however, the Union's petition and the election are blocked because of Respondent's unfair labor practices described below.  The Union is prepared to proceed to an election if this court grants the injunction.

## C.  Unfair Labor Practice Charges and Complaint

As described in the petition, based upon unfair labor practice charges filed by the Union, on October 24, a complaint issued, alleging that Respondent violated Section 8(a)(1) and (3) of the Act.

## III.  ARGUMENT

## A.  The Statutory Scheme

Section 10(j) of the Act,[3] authorizes United States district courts to grant temporary injunctions pending the Board's resolution of unfair labor practice proceedings.  This provision embodies Congress' recognition that, because the Board's administrative proceedings are often protracted, in many instances, absent interim relief, a respondent could accomplish its unlawful objective before being placed under any legal restraint, and it could thereby render a final Board order ineffectual. See S. Rep. No. 105, 80th Cong., 1st Sess., at pp. 8, 27 (1947), reprinted in 1 Legislative History of the Labor Management Relations Act of 1947, 414, 433 (Government Printing Office 1985).  See also Boire v. Pilot Freight Carriers, Inc., 515 F.2d 1185, 1188 (5th Cir. 1975), reh. and reh. en banc denied, 521 F.2d 795, cert. denied, 426 U.S. 934 (1976).

---

[1] All dates referred to herein are in the year 2002.

[2] Respondent's Request for Review of this Decision and Direction of Election is pending before the Board.

[3] Section 10(j) (29 U.S.C. Section 160(j)) provides:

> The Board shall have power, upon issuance of a complaint as provided in subsection (b) charging that any person has engaged in or is engaging in an unfair labor practice, to petition any district court of the United States ..., within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

To resolve a Section 10(j) petition, a district court in the Eleventh Circuit considers only two issues: whether there is "reasonable cause to believe" that a respondent has violated the Act and whether injunctive relief is "just and proper". Arlook v. S. Lichtenberg & Co., Inc., 952 F.2d 367, 371 (11th Cir. 1992).

### 1. The "Reasonable Cause" Standard

In determining whether there is reasonable cause to believe that the Act has been violated, the district court may not decide the merits of the case.  See Arlook v. S. Lichtenberg & Co., Inc., 952 F.2d 367, at 372-373 (11th Cir. 1992), citing Boire v. Pilot Freight Carriers, Inc., 515 F.2d 1185, 1191 (5th Cir. 1975).  Rather, the district court's role is limited to evaluating whether (1) the Regional Director's theory of a violation is "substantial, nonfrivolous [and] coherent" and (2) the evidence, considered in the light most favorable to the Board, would permit a rational factfinder to rule in the Board's favor.  Arlook v. S. Lichtenberg & Co., Inc., 952 F.2d at 371-372.  Accord: Boire v. Int'l Bhd. of Teamsters, 479 F.2d 778, 789-792 (5th Cir. 1973), reh. and reh. en banc denied, 480 F.2d 924 (1973) (legal theories need only be "substantial and not frivolous").  In determining whether the Regional Director has met this "minimal burden" (Boire v. Pilot Freight Carriers, Inc., 515 F.2d at 1189), a district court should not attempt to resolve conflicts in the evidence or the credibility of witnesses.  Arlook v. S. Lichtenberg & Co., Inc., 952 F.2d at 372-373; Gottfried v. Frankel, 818 F.2d 485, 493, 494 (6th Cir. 1987) (district court is not permitted to resolve conflicts in the evidence; Respondent's attack on credibility of Board's witnesses merely establishes conflict in the evidence); Fuchs v. Jet Spray Corp., 560 F. Supp. 1147, 1150-1151 n. 2 (D. Mass. 1983), affd. per curiam, 725 F.2d 664 (1st Cir. 1983) (same).

### 2. The "Just and Proper" Standard

Injunctive relief is "just and proper" under Section 10(j) "whenever the facts demonstrate that, without such relief, any final order of the Board will be meaningless or so devoid of force that the remedial purposes of the [NLRA] will be frustrated." Arlook v. S. Lichtenberg & Co., Inc., 952 F.2d at 372, quoting Boire v. Pilot Freight Carriers, Inc., 515 F.2d at 1192.  In the Eleventh Circuit, injunctive relief is shown to be "equitably necessary" where, for example, union organizational efforts are being extinguished by employer unfair labor practices, unions and employees have already suffered substantial damage from probable violations, and future violations are likely to be repeated absent an injunction.  Arlook v. S. Lichtenberg & Co., Inc., 952 F.2d at 372.  Therefore, it is "just and proper" for a district court to grant interim relief where a Section 10(j) injunction would be "more effective" to protect employee statutory rights than a final Board order.  Id., 952 F.2d at 374.

**B.  There is Reasonable Cause to Believe that Respondent Violated
Section 8(a)(1) and (3) of the Act.**

Section 8(a)(1) of the Act makes it an unfair labor practice for an employer to "interfere
with, restrain, or coerce employees in the exercise of rights guaranteed in Section 7 [of the
Act]", which provides that "employees shall have the right to form, join or assist labor
organizations ..."  Section 8(a)(3) of the Act prohibits "...discrimination in... employment... to
encourage or discourage membership in any labor organization..."

As described below, there is reasonable cause to believe that Respondent violated
Section 8(a)(1) and (3) of the Act.

### 1. Facts Supporting the Reasonable Cause Standard

#### a. Union Organizing Activities

In late June/early July, the Union began an organizing campaign in the approximately
420-employee unit, and, as noted above, filed a representation petition on July 15.

From July 15 through July 18, Plant Manager Valle observed several union organizers,
along with four or five employees, stationed at the entrance to Respondent's parking lot handing
out union flyers and speaking with employees, as well as employees wearing union buttons.
During this same time frame, employee Sadius Isma overtly distributed union authorization
cards and spoke with co-workers about the Union during break times.

#### b. July 15: Interrogation and Threats

On Monday, July 15, after receiving and signing a union authorization card outside of
Respondent's parking lot, an employee was approached by Supervisor Etalvina "Vina" Martin
and was asked if she signed a piece of paper.  Martin then directed the employee not to sign
any paper for the Union, and informed the employee that if the company became unionized,
they would all lose their jobs because it would close down.

#### c. July 17 and 18: Union Meeting and Presentation of Letters

On Wednesday, July 17, approximately 100 employees attended a union meeting,
wherein they decided that a small group of employees would present two documents to
Respondent's supervisors during the morning break on the following day. The first document
was a letter informing Respondent that its employees wanted the Union to be their collective-
bargaining representative.  The second document was a letter requesting that Respondent
remain neutral during the period before the election.  The employees chose Sadius Isma to be
their spokesperson while presenting the documents to Respondent's supervisors.  The other
employees decided that they would walk behind Isma to demonstrate their union support.

On Thursday, July 18, employee Isma and his co-workers left their departments at the 9:40 a.m. break time in order to present the two letters to Respondent.  Approximately 100 employees followed behind Isma chanting, "*Si Se Puede*".[4]  As the employees approached President Hatfield's office, they met Chief Operating Officer (COO) Graves and Human Resource Manager Dominguez at the office door.  As the documents were handed to these supervisors, Isma explained the purpose of each letter.  COO Graves said that she would not accept either document and that the employees were doing something illegal.  Dominguez accepted the documents and Isma turned towards his co-workers and began chanting with them.  When the ten-minute break ended, all of the employees returned to their work stations and began working.

### d.  July 18:  Threat and Sending Employees Home Early

Upon her return to her work station, one union supporter was approached by Supervisor Martin, who informed her that if she got up again, she would be sent home.  Martin made similar statements to the others in her department, who were wearing union buttons.

A few minutes after the break ended, the police arrived at Respondent's facility.  Isma was sent to the office where several police officers and Respondent's representatives were waiting.  Isma was asked to tell all of the employees that they had to leave the facility because it was closing at 11:00 a.m.  During the discussion, Isma agreed to act as a translator for Respondent as most of the employees speak Spanish or Haitian Creole, but this offer was rejected.  Shortly thereafter, employees were directed to leave the facility and return the following morning.   As they left, the employees chanted "*Si Se Puede*" and "*Agua*", the latter referring to the fact that they were not provided with enough water during breaks.

Once outside, the employees were directed to leave Respondent's parking lot and they moved to a parking lot of an apartment building adjacent to Respondent's facility, protesting the unlawful early dismissal.  The police arrested Isma charging him with unlawful assembly and took him to the police station, based on their conclusion that he was the leader of the employees.

### e.  July 18:  Discharge of Sadius Isma and Union Meeting

At around noon on this same day, the police took Isma back to Respondent's facility, and upon their arrival, Dominguez handed Isma a termination letter[5].

---

[4] "*Si se puede*" means "yes we can" in Spanish.
[5] The termination letter states that he was terminated for "violating company policy" for "engaging in threats or conduct threatening to others during working hours or on company premises."

Isma arrived at the union meeting, where over 150 employees had gathered.  He explained that he had been arrested and later terminated.  The employees decided that they would arrive to work an hour before the morning shift began on the following day, and would stand outside the facility chanting "*Si Se Puede*."

### f.  July 19:  Changes in Schedules, Denial of Overtime, and Threats

On July 19, a majority of those at the union meeting went to work early and chanted outside of the facility as planned.  Police officers were present in the parking lot, and newly hired security guards, as well as metal detectors, were installed at the facility entrances.  The police officers and security guards also stood watch in all of the departments.

During that day, Respondent announced over the speaker system that all the employees in the various departments had new start time and break time schedules, which no longer overlapped.  It also announced that employees could only go to different departments for work-related reasons and that they could no longer talk to co-workers.

Supervisors also personally informed employees of these changes on this date.  For example, Supervisor John Jairo Castillo told employees in his department that there would be no more overtime assignments.[6]  Supervisor Blanca Frias, whose department consisted of about 30 employees, and Supervisor Zalina Ali, whose department consisted of about 20 employees, similarly announced to their respective employees that they would no longer be assigned overtime.[7]  Supervisor Martin informed another employee of the loss of overtime assignments as well.   As discussed below, overtime assignments were reinstated on August 9.

Also on July 19, Supervisor Blanca Frias gathered the employees in her department and said that the Union would not work there and that no one should be supportive of it.  She announced that management would close the company and that it would be moved.

### g.  July 22:  Interrogations, Promises and Threat

On July 22, Supervisor Martin questioned an employee about what the Union was offering and stated that Respondent already provided benefits.  When the employee noted the lack of medical insurance, water, and air conditioning at Respondent's facility, Supervisor Martin promised that those problems would be fixed, and said that the employee would be one of the first ones to get a wage increase.  Supervisor Martin also questioned employees about their union membership.  On a date in late July, Martin promised a union supporter a promotion.

---

[6] Prior to this date, many employees worked one to two hours of overtime on weekdays and more hours of overtime on Saturdays.

[7] After Castillo's announcement, two anti-union workers commented to the others that there was no longer overtime because of the union activities.

Plant Manager Juan Valle also asked employees what the Union was offering and told employees that the Union takes money away from the employees who are union members. Valle told one employee that she was one of the best employees and that she would be one of the first employees to receive a wage increase. Valle specifically asked this employee if she was in the Union, then reiterated that she was a good employee and remarked that he did not want to see her go. As the meeting concluded, he wrote the employee's name down and then similarly approached other employees who wore union buttons, with Supervisor Martin.

### h.  July 25:  Threats of Plant Closure and Loss of Jobs and Union Meeting

On July 25, Plant Manager Valle called some overt union supporters into his office. Valle informed these employees that, because of the Union, the company was not receiving contracts and, instead, was losing them. He explained that, because of this, it could close; hence, the employees were putting themselves and their families in a perilous situation. Valle directed the employees to think about what he said before signing anything or joining the Union.

Over 100 employees attended the union meeting held on July 25.

### i.  July 29:  Threats of Plant Closure, Loss of Jobs, and Benefits

On July 29, President Sandra Hatfield and Supervisor Zalina Ali informed employees that their material was to be packed into boxes because they were going to be shipped out and sent to another factor for completion. Supervisor Ali then informed employees that Respondent was taking the materials to another factory, that there might not be any more work in the future, and that Respondent might close. When asked for an explanation, she responded that all of these problems were because the Union wanted to take over Respondent's facility. She repeated these comments about plant closure on later dates and also remarked that the Union could not make Respondent give the employees benefits, such as insurance and better working conditions.

### j.  Late July:  Threats of Plant Closure, Loss of Wages, and Unspecified Reprisals

In late July, Supervisor John Jairo Castillo gathered employees together and said that when the Union came in, the negotiations would start at $5.15 an hour.[8] When an employee challenged his statement, Castillo said that Respondent could close.

Around this same time, Supervisor Castillo asked employee Briseno to come to his office, where Supervisor Castillo advised him that if he were Briseno he would remove his union button. Briseno enumerated problems with Respondent and said that he wore the union button because he believed that the Union could rectify these problems. Supervisor Castillo

---

[8] The employees were then making approximately $6.00 per hour.

responded by stating that Respondent would defend itself, would not let itself become unionized, and could close down if the Union pressured it.

### k.  August 1:  Discharge of Carlos Alejandro Briseno

On August 1, employee Briseno finished his shift at 4:00 p.m. and clocked out.  After clocking out, Briseno went over to the cans containing discarded scraps of material, which are later placed in the garbage dumpsters.  Briseno overtly took a scrap of material from the can to make a sheath for a knife that he uses at work to cut material and, after doing so, walked past two supervisors without incident.  While waiting in his vehicle for his wife to clock out, Supervisor John Jairo Castillo approached him and asked if he took anything from the company. Briseno showed him the scrap of material, which prompted Supervisor Castillo to ask who had provided him with permission to take the material.  Briseno responded that it had been in the garbage can, and Supervisor Castillo confiscated the scrap of material.   Supervisor Castillo then returned to Briseno's vehicle with HR Manager Dominguez.  Dominguez asked Briseno if he was aware that employees could not remove scraps of material.  Briseno reiterated that it was garbage.  Supervisor Castillo then informed Briseno that he was terminated.  Briseno asked, while pointing to his union button, if he was being discharged "for this".

On August 2, Briseno went to the HR department, where HR Manager Dominguez reiterated that he was fired for stealing.  Briseno asked for documentation regarding his discharge, and Dominguez responded by stating that Respondent did not have to provide him with any.

### l.  August 2:  Threats of Transfer of Work and Layoffs

On August 2, Respondent sent a memo to employees informing them that the company would not tolerate the alleged "slowdown" activity of certain employees.  It specifically stated that "the company is making arrangements to transfer work to outside contractors and is making preparations to lay off employees.  Employees who engage in the slowdown activity will be selected first for layoff."

### m.  August 7:  Union Meeting

On August 7, the Union held another meeting.  About 30 fewer employees were present than at the previous meeting.  The employees voted in favor of striking if Respondent continued to engage in its unfair labor practices, particularly if it discharged any more union supporters.

### n.  August 8:  Warning to Cadet and Early Dismissal

On August 8, discriminatee Midho Cadet returned from the restroom and found Supervisor Martin waiting for him with Plant Manager Valle approaching.  Supervisor Martin informed Plant Manager Valle that Cadet had spent 10 minutes in the bathroom, which Cadet

denied.  Plant Manager Valle directed Cadet to sign a disciplinary action form, to go home and to return the following day.  Cadet refused to sign the form and was sent home.

### o. August 9:  Discharge of Cadet and Walkout in Protest

On August 9, after punching in, Midho Cadet was directed to follow Plant Manager Valle to his office.  Once there, Cadet was told to return his ID badge because he was terminated. Cadet asked for an explanation and Plant Manager Valle told him it was due to Cadet's refusal to sign the form.  Cadet then went to the HR department where HR Manager Dominguez stated that he was discharged for spending 10 minutes in the bathroom.

Word of Cadet's discharge immediately circulated through Respondent's facility.  In response, about 70 employees walked off the job.

### p. August 9:  Threat of Loss of Jobs and Promises

The morning of Cadet's discharge, in response to the walkout, Supervisor Pamalaza approached two employees and informed them that the employees could go on strike for three days, after which time they would lose their jobs.

At the end of the day, President Sandra Hatfield thanked the remaining employees for not walking out in protest.  She stated that she had promised them a raise for two years and was going to see if she could solve that problem.  After some employees complained about the new start time of 8:00 a.m., which had been changed from 7:30 a.m. on July 19, President Hatfield agreed to consider their complaint.

### q. August 10:  Union Meeting

On August 10, the Union held a meeting and approximately 115 employees attended. The employees nominated and elected picket captains and committees.

### r. August 12:  Ongoing ULP Strike

On August 12, employees established four picket lines outside each of the entrances to Respondent's facility.  The strike continues to date.

### s. August 28:  Letter to Employees Threatening Permanent Replacement

On August 28, Respondent sent and posted on a fence a letter informing employees that the strikers had been "permanently replaced" and that they no longer had jobs.  The letter further stated that, if any of the strikers wished to return to work, they would be placed on a "preferential recall list", and that, if there were any job openings in the future, Respondent would "consider" the individuals on the list for those openings before other applicants.

### 2. Conclusions under Reasonable Cause to Believe Standard
#### a. 8(a)(1) Violations

As demonstrated above, there is reasonable cause to believe that Respondent made numerous unlawful statements to employees, in violation of Section 8(a)(1) of the Act, in order to nip in the bud the Union's nascent organizing activities.[9]  Such statements included unlawful interrogations, promises of benefits, and threats of reprisals.[10]  Respondent also unlawfully limited employees' movement and their discussions with one another.

#### b. 8(a)(3) Violations

Further, there is reasonable cause to believe that Respondent violated Section 8(a)(3) of the Act when it: i) sent all employees home early in response to their presentation of letters requesting recognition of the Union and neutrality during the critical period; ii) changed scheduled start times, break times and lunch times, and denied overtime assignments to all employees until commencement of the ULP strike, iii) discharged employee Sadius Isma; iv) discharged employee Carlos Alejandro Briseno; and v) warned, with concurrent early dismissal, and discharged Midho Cadet.

##### i. Sending Employees Home Early

Respondent's decision to send employees home early on July 18 was motivated by union animus and was in retaliation for their union and concerted, protected activities.  The evidence supporting this includes unlawful interrogations and threats made to employees on this date and the days just preceding it by Respondent's supervisors, in addition to the timing of Respondent's decision to send the employees home, which immediately followed the employees' requests for recognition of the Union or neutrality during the period directly before the election.  In fact, Respondent sought to have Isma, who had been the spokesperson for the employees, be the one to inform the employees that the facility was shutting down within 90 minutes after their display of solidarity.

##### ii. Changes in Schedules and Denial of Overtime

There is also reasonable cause to believe that, on July 19, Respondent violated Section 8(a)(3) by changing employees' scheduled work times, break times, and lunch times, and by denying overtime assignments to all employees until the commencement of the strike.

---

[9] See generally <u>NLRB v. Brewton Fashions, Inc.</u>, 682 F.2d 918, 921 (11th Cir. 1982).
[10] See <u>NLRB v. Gissel Packing Co.</u>, 395 U.S. 575, 617-618 (1969) (employer predictions of consequences of unionization "must be carefully phrased on the basis of objective fact" and "must take into account…the necessary tendency of [employees]…to pick up intended implications [of their employer] that might be more readily dismissed by a more disinterested ear."); <u>Weather Tamer, Inc. v. NLRB,</u> 676 F.2d 483 (11th Cir. 1982).

Specifically, upon the employees' return to work the day after being sent home early, they were informed, personally and via the speaker system, that their start times, break times and lunch times would no longer overlap with one another, and that they would no longer be provided with overtime.   Indeed, the timing of these schedule changes and the denial of overtime, combined with the evidence of Respondent's union animus through its unlawful interrogations, threats, and prohibition of access to co-workers at all times, established that these changes were put into effect to punish the employees for their union and concerted, protected activities that took place the preceding the day, as well as to prevent further union and concerted, protected activities.  See NLRB v. Dixie Gas, Inc., 323 F. 2d 433, 434, 54 LRRM 2268 (5th Cir. 1963) (employer acted unlawfully by making working conditions more onerous and by withdrawing pre-election privileges after the employees voted for the union).

### iii. Discharge of Sadius Isma

There is reasonable cause to believe that Respondent's discharge of Sadius Isma violated Section 8(a)(3) of the Act.  Respondent had knowledge of his union activities and support, including his actions as the lead employee spokesperson for the Union when the employees presented their letters to Respondent's supervisors.  Respondent's knowledge of his leadership role, combined with Respondent's anti-union statements and the timing of his discharge, clearly supports the conclusion that Isma was discharged in retaliation for his union activities and in order to send a message to other employees that union activities would not be tolerated.

Respondent's claim that it discharged Isma for "engaging in threats or conduct threatening to others during working hours or on company premises", and that such conduct was grounds for immediate termination under its disciplinary policy, is pretextual.

The specific references in the police reports regarding Isma's conduct include a report by COO Rhonda Graves who charged that employees Virginia Salazar and Sadius Isma told her that she "made a mistake" by refusing to accept the recognition and neutrality letters, and the police officers' opinion that Isma led the employees in their chanting outside the facility after Respondent closed early and in their ignoring police officer requests to keep out of the roadway.

Neither the conduct set forth in the police reports, nor his arrest, caused Isma to lose the protection of Section 7 of the Act.  Assuming, without conceding, that Isma engaged in misconduct at the time that he attempted to provide the recognition and neutrality letters to Respondent's supervisors, in evaluating an employee's misconduct during a strike or other concerted, protected activity, one must look at whether it was such that "under the circumstances existing, it may reasonably tend to coerce or intimidate employees in the

exercise of rights protected under the Act."[11]  This standard is also applied to conduct directed at persons who do not enjoy the protection of Section 7 of the Act.[12]   The fact that an employee is arrested for violating state law does not mean that the employee loses the protection of the Act, but rather, the employee's conduct must be evaluated under the Act, and not state law, to determine whether the employee's alleged "misconduct" provided justification for his termination.[13]

To the extent that Respondent attempts to rely on Isma's and Salazar's alleged statement to COO Graves inside the facility that she "made a mistake" by refusing to accept the letters, such statement was too ambiguous under the circumstances to constitute a "threat" sufficient to support Isma's discharge.[14]  Furthermore, Respondent condoned this conduct when it failed to also discharge Salazar.

Assuming that Respondent relied on the conduct that took place outside Respondent's facility when employees were protesting their unlawful early release, such activity likewise does not constitute misconduct sufficient to cause Isma to lose the protection of the Act, despite his arrest for unlawful assembly.  Furthermore, that conduct occurred off Respondent's premises on non-working time, not "during working hours or on company premises" as stated in the termination letter.

In evaluating whether an employee has engaged in such "misconduct," the Board has found that blocking ingress or egress on a single occasion for a short duration, and in the absence of physically aggressive conduct or other intimidating behavior, does not constitute serious misconduct sufficient to justify the discharge of an employee otherwise engaged in concerted, protected activity.[15]

At most, the police reports indicate that, Isma led employees in the blocking of a roadway for a short duration of time.  According to the police reports, Isma was arrested

---

[11] Clear Pine Mouldings, Inc., 268 NLRB 1044, 1046 (1984), enfd. mem., 765 F.2d 148 (9th Cir. 1985), cert. denied 474 U.S. 1105 (1986).
[12] Catalytic, Inc., 275 NLRB 97, 97 n.4 (1985).
[13] Id. at 98 n. 13.
[14] See generally Catalytic Inc., 275 NLRB at 98 (employee called non-striking employee on the telephone and said, "you goddamned bitch" before hanging up did not cause employee to lose protection of the Act where employee did not threaten either the non-striking employee's person or property).
[15] See, e.g., Domsey Trading Corp., 310 NLRB 777 (1993) (striker, who occupied entranceway on couple occasions and, at most created some minor interference, was entitled to reinstatement), enfd. 16 F.3d 517 (2nd. Cir. 1994); Hotel Roanoke, 293 NLRB 182 (1989) (striker, who engaged in blocking incident in the absence of evidence as to the extent traffic was actually blocked or inconvenienced, was entitled to reinstatement).  Cf. Tube Craft, 287 NLRB 491 (1987) (strikers, who engaged in more than one episode of blocking and some for substantial periods of time, were not entitled to reinstatement); M.P.C. Plating, Inc., 295 NLRB 583 (1989) (strikers, who engaged in more than one episode of blocking and many also engaged in pushing, threats, and throwing objects, were not entitled to reinstatement.), enfd. in relevant part, 953 F.2d 1018 (6th Cir. 1992).

because the police perceived him as the leader of a group of employees who blocked the roadway for a short time while chanting.    There is no evidence that Isma engaged in a pattern of such activity or that he engaged in this activity in any confrontational or intimidating manner. In fact, the police officer that arrested him provided him with a courtesy ride back to his vehicle. Lastly, it is unclear whether Isma and the other employees had even intended to block the roadway.  Indeed, unintentional blocking of the roadway was likely to occur given that Respondent had just closed the facility and sent hundreds of employees outside.

### iv. Discharge of Carlos Alejandro Briseno

There is reasonable cause to believe that Respondent discharged Carlos Alejandro Briseno in violation of Section 8(a)(3) of the Act.  The evidence demonstrates that Respondent had knowledge of his union support, that Respondent had strong anti-union animus, and that the asserted reasons for his discharge were pretextual.

Briseno wore a union button on a daily basis in the weeks prior to his discharge.  In fact, Briseno's union button was a topic of conversation between him and Supervisor John Jairo Castillo in late July, when Supervisor Castillo advised him that if he were Briseno he would remove the button, and then proceeded to threaten plant closure.

According to Briseno, he was told that he was discharged for taking discarded scrap material.  The evidence indicates that this reason is clearly pretextual.  As an initial matter, Respondent does not have a published rule against taking such scraps and the employees have never been put on notice of such a prohibition.[16]  Secondly, prior to his discharge, Briseno saw other employees, including supervisors, take scraps on a regular basis to remove spills and to clean their hands.  Third, Briseno had previously taken scraps to clean the windows of his vehicle and to protect himself from the rain, without incident.  Lastly, other employees used the scraps as aprons, as tool holders and as protection from rain with the knowledge of supervisors and without admonishment.

Assuming arguendo that Briseno's actions could be viewed as misconduct, the punishment of discharge does not "fit the crime", which lends credence to the inference of a retaliatory motive.[17]  Given the evidence of Respondent's knowledge of his union support, his refusal to remove his union button even after being advised to do so by his supervisor, and the significant evidence of anti-union animus, it appears that Respondent  was seizing upon what

---

[16] See NLRB v. Big Three Industrial Gas & Equipment Co., 579 F. 2d 304, 312-313, 99 LRRM 2223 (5th Cir. 1978), cert. denied 440 U.S. 960 (1979) (disparate enforcement of employer's policy is unlawful).

[17] See, e.g., NLRB v. Mini-Togs, Inc., 980 F.2d 1027, 1036, 142 LRRM 2265 (5th Cir. 1993); Neptune Water Meter Co. v. NLRB, 551 F.2d 568, 570, 94 LRRM 2513 (4th Cir. 1977); NLRB v. Cousins Associates, Inc., 283 F.2d 242, 243, 46 LRRM 3045 (2d Cir. 1960) (discharge for minor acts of misconduct found pretextual and unlawful).

was, at most, a minor infraction, to "send a message" to the other employees who supported the Union.[18]

### v. Warning, Early Dismissal, and Discharge of Midho Cadet

There is reasonable cause to believe that Respondent warned, with concurrent early dismissal, and then discharged Midho Cadet in violation of Section 8(a)(3) of the Act. The evidence demonstrates that the Respondent had knowledge of his union support (through his wearing of a union button), that Respondent had strong union animus as expressed through its unlawful statements and actions, and that the asserted reasons for his warning, early dismissal, and discharge were pretextual.

Respondent informed Cadet that he was being given a warning and being sent home early for allegedly spending 10 minutes in the bathroom. When he refused to sign the warning due to his disagreement with the assessment, Plant Manager Valle sent him home anyway. The following day, Plant Manager Valle informed him that he was discharged due to his refusal to sign the disciplinary action form. However, HR Manager Dominguez informed Cadet that he was terminated for spending 10 minutes in the bathroom. As with Briseno, the reasons given Cadet for his warning and termination do not withstand scrutiny.

Respondent's shifting reasons for the actions taken against Cadet support the conclusion that they were discriminatory. See Abbey's Transportation Services v. NLRB, 837 F.2d 575, 581 (2d Cir. 1988) (shifting assertions strengthen the inference that the true reason was for union activity); NLRB v. Schill Steel Productions, Inc., 340 F.2d 568, 573 (5th Cir. 1965) (vacillation and multiplicity of alleged reasons for company action render its claims of nondiscrimination the less convincing.) Additionally, the evidence establishes that, because there are only two bathrooms in the facility, employees typically have to wait several minutes before one is available. Furthermore, the evidence fails to show that employees were ever being disciplined for a similar reason prior to the union organizing efforts, despite the fact that others have taken bathroom breaks longer than 10 minutes with supervisory knowledge.[19]

As with Briseno, assuming, without conceding, that Cadet's actions could be viewed as misconduct, such misconduct is so minor that the severity of his punishment raises a strong inference of retaliatory motive.[20] Given the evidence of Respondent's knowledge of his union

---

[18] See NLRB v. Eastern Massachusetts Street Railway Co., 235 F.2d 700, 709-710, 38 LRRM 2520 (1st Cir.), cert denied 352 U.S. 951 (1956) (minor offense used as pretext for punishment for engaging in protected activity).
[19] See NLRB v. Big Three Industrial Gas & Equipment Co., supra. (disparate enforcement of employer's policy is unlawful).
[20] See, e.g., NLRB v. Mini-Togs, Inc., 980 F.2d 1027, 1036, 142 LRRM 2265 (5th Cir. 1993); Neptune Water Meter Co. v. NLRB, 551 F.2d 568, 570, 94 LRRM 2513 (4th Cir. 1977); NLRB v. Cousins Associates, Inc., 283 F.2d 242, 243, 46 LRRM 3045 (2d Cir. 1960) (discharge for minor acts of misconduct found pretextual and unlawful).

support, and the overwhelming evidence of anti-union animus, it appears that Respondent was seizing upon what was, at most, a minor infraction, to "send a message" to the other employees who supported the Union.[21]

By discharging three known union adherents, changing employees' schedules, denying employees overtime and sending them home early at the very nascent stages of an organizing drive, Respondent has attempted to destroy the Union's status in the organizational campaign as well as the "laboratory conditions" necessary to permit the holding of a fair Board-conducted election to determine whether Respondent's employees wish to choose the Union as their collective-bargaining representative.  District courts have ordered reinstatement of union adherents using Section 10(j) authority in cases less egregious than the instant one.  See, Pye v. Excel Case Ready, 238 F.3d 69 (1st Cir. 2001); Sharp v. Webco, Inc., 225 F.3d 1130 (10th Cir. 2000); Gottfried v. Frankel, 818 F.2d 485 (6th Cir. 1987); Eisenberg v. Wellington Hall Nursing Home, Inc., 651 F.2d 902, 907 (3rd Cir. 1981).  See also Arlook v. S. Lichtenberg & Co., Inc., 952 F.2d, 367 (11th Cir. 1992).

### c. The Strike

Moreover, Respondent's unfair labor practices clearly caused the employees to walk out on August 9 and to engage in the strike that commenced on August 12.  The walkout was in direct response to the discriminatory discharge of Cadet, after employees had decided to strike if Respondent continued to unlawfully discharge employees.  See NLRB v. Crystal Springs Shirt Corp., 637 F. 2d 399, 404, 106 LRRM 2709 (5th Cir. 1981) (employer's unlawful conduct caused an unfair labor strike).

Based upon all of Respondent's unlawful conduct, there is reasonable cause to believe that a final Board order will grant reinstatement to the strikers upon their unconditional offer to return to work, displacing, if necessary, any replacements.[22]  Therefore, interim reinstatement of the unfair labor practice strikers upon their unconditional offer to return to work, displacing, if necessary, any replacements, is clearly appropriate.

### d. The Single Employer Issue

There is reasonable cause to believe that Point Blank Body Armor, Inc. and NDL Products, Inc. are a "single employer" under the Act.

---

[21] See NLRB v. Eastern Massachusetts Street Railway Co., 235 F.2d 700, 709-710, 38 LRRM 2520 (1st Cir.), cert denied 352 U.S. 951 (1956) (minor offense used as pretext for punishment for engaging in protected activity).
[22] Beaird Industries, Inc., 311 NLRB 768, 770-771(1993); D'Armigene, Inc., 148 NLRB 2, 3 (1964), enfd. In relevant part 353 F. 2d 406, 60 LRRM 2462 (2d Cir. 1965).  Accord:  NLRB v. J.H. Rutter-Rex Mfg. Co., 245 F. 2d 594, 597-598, 40 LRRM 2213 (5th Cir. 1957).

In determining whether two business entities comprise a single employer, the Board examines the following four factors: (1) common ownership, (2) common management, (3) interrelation of operations, and (4) centralized control of labor relations.[23]

All four of the single employer factors are satisfied in this case. Common ownership is present here because Point Blank and NDL are wholly owned subsidiaries of the same parent corporation. As for common management, although each subsidiary has its own chief executive, there is substantial direct common supervision of employees. Approximately 67 percent of NDL's workforce is supervised by Point Blank supervisors.

Considerable evidence also establishes the interrelation of operations. First of all, both subsidiaries share a production facility where their employees work in close proximity to each other and some machinery is used interchangeably between the subsidiaries. Secondly, Point Blank frequently uses NDL employees to make Point Blank products in situations where Point Blank needs additional help, where NDL work is lacking, or where Point Blank has overtime work available.[24] Furthermore, when NDL employees perform overtime work for Point Blank, they are paid time and a half even though they have not worked 40 hours for Point Blank during the week. NDL employees are also permitted to transfer employment to Point Blank without loss of seniority or benefits. Lastly, Point Blank is engaged in a "mentoring" arrangement with NDL that is designed to introduce NDL to the government contract process. Pursuant to this arrangement, around 70 percent of NDL's garment makers are directly supervised by Point Blank supervisors when they make coveralls to satisfy Point Blank's government contract. All of this interchange between the two entities establishes the absence of an "arm's length relationship."[25]

Finally, centralized control of labor relations is also present here. Point Blank and NDL share a common human resources department and a common employee handbook. The handbook establishes the same fringe benefits and personnel policies for both sets of employees. Point Blank also issues paychecks to NDL employees.

### C. Injunctive Relief is Just and Proper

When invoking Section 10(j) authority, district courts do not look to the harm to individual employees, but rather consider the overall harm to the collective-bargaining process or to other

---

[23] See, e.g., NLRB v. M.P. Bldg. Corp., 411 F.2d 567, 568, 71 LRRM 2293 (5th Cir. 1969) (per curiam); Denart Coal Co., 315 NLRB 850, 851 (1994), enfd.sub nom. Vance v. NLRB, 71 F.3d 486, 155 LRRM 2684 (4th Cir. 1995)

[24] See NLRB v. Al Bryant, Inc., 711 F.2d 543, 552, 113 LRRM 3690 (3d Cir. 1983), cert denied 464 U.S. 1039 (1984) (finding two entities were single employer based, in part, on ALJ noting "frequent and seemingly at random interchange of craftsmen").

[25] Denart Coal Co., 315 NLRB at 851

protected activities if a remedy awaits the Board's final decision.  Wells v. Brown & Root, Inc.,
65 F. Supp. 2d. 1264, 1277 (S.D. Ala. 1999).

In the instant case, as noted above, the evidence reveals that Respondent has engaged
in a pattern of unfair labor practices clearly designed to destroy this nascent union organizing
campaign.  Respondent committed numerous violations of Section 8(a)(1) of the Act that
include: a) interrogations; b) threats of plant closure, loss of jobs, loss and removal of work,
transfer of work, discharge, layoff, early dismissal, wage reductions, loss of benefits, unspecified
reprisals, and permanent replacement; c) promises of wage increases, promotions, start time
changes, better working conditions and medical insurance; and d) limitations on the movement
of employees and discussions among employees.  In addition to the numerous violations of
Section 8(a)(1) of the Act, Respondent committed serious violations of Section 8(a)(3) of the
Act, including:  a) sending every employee home early after employees requested recognition of
the Union or neutrality during the critical period prior to an election; b) changing employees'
schedules and denying overtime; c) discharging the lead employee spokesperson for the union;
and d) discharging two other union supporters, one of whom was also warned and sent home
early.

The courts have repeatedly found that Section 10(j) relief is just and proper where an
employer has committed serious unfair labor practices in response to its employees' union
organizing drive.[26]  It is noted that, although the unit is large, many of these unfair labor
practices were directed at entire departments of employees, if not the entire unit.

Injunctive relief is just and proper to help restore the "laboratory conditions" in this unit as
soon as possible so as to permit the unblocking of the representation petition that is pending.[27]
As noted above, the Union is willing to proceed to an election if this court grants the relief
sought in the petition.  Absent injunctive relief, the Union will be forced to await a Board order in
due course to remedy Respondent's unfair labor practices and thus restore laboratory
conditions in order for a fair election to be conducted.  The Union will inevitably lose employee
support through this passage of time.[28]

---

[26] Schaub v. West Michigan Plumbing & Heating, Inc., 250 F.3d 962, 970-972 (6th Cir. 2001); Sharp v. Webco
Industries, Inc., 225 F. 3d 1130, 1135-37, 165 LRRM 2353 (10th Cir. 2000).
[27] See NLRB v. Houston Chronicle Publishing Co., 300 F.2d 273, 278, 49 LRRM 2782 (5th Cir. 1962) ("in election
proceedings, it is the function of the Board to provide 'a laboratory' in which an experiment to determine the
uninhibited desires of the employees may be conducted under conditions as nearly ideal as possible.").  Accord:
Anchors Inn, Inc. v. NLRB , 644 F.2d 292, 299, 106 LRRM 2860 (3d Cir. 1981); General Shoe Corp., 77 NLRB
124, 127 (1948).
[28] See Paul C. Weiler, "Promises to Keep: Securing Workers' Rights to Self-Organization Under the NLRA," 96
Harv. L. Rev. 1769, 1777 n. 24 (1983) and the studies cited therein ("The delay between the filing of a petition and

Injunctive relief, including an appropriate cease and desist order, the prompt interim reinstatement of employees Sadius Isma, Carlos Alejandro Briseno, and Midho Cadet, as well as of those strikers who offer to return unconditionally, displacing, if necessary, those who have replaced them and rescission of the changes in working conditions[29], is necessary to protect the vitality of the Union's organizing campaign.[30] Interim reinstatement will reassure the remaining employees that support for the Union will not leave them subject to Respondent's retaliation.[31] In addition, interim reinstatement is just and proper to restore to the unit the three discharged employees before they scatter to other jobs and interests.[32] Their interim reinstatement may become a catalyst for the remaining strikers to offer to return to work unconditionally before they too scatter to other jobs and interest. Courts have often granted interim reinstatement under Section 10(j) to unfair labor practice strikers who were entitled to immediate recall upon their unconditional offer to return to work.[33]

---

the vote is itself detrimental to union organizing success. As delay increases, enthusiasm for the union may wane, and turnover may deprive the union of some of its support.").

[29] To properly restore the lawful status quo and remove any chilling impact on employee support for the Union, the injunction order should require Respondent to rescind its discriminatory changes in unit employees' working conditions and restore those terms and conditions that existed before July 15, 2002. See Gottfried v. Frankel, 818 F. 2d 485, 494-495, 125 LRRM 2321 (6th Cir. 1987); Bordone v. Talsol Corp., 799 F. Supp. 796, 802, 141 LRRM 2389 (S.D. Ohio 1992); Allen v. Yellow Cab Cooperative, 101 LRRM 2593, 2596 (N.D. Cal. 1979).

[30] See NLRB v. Electro-Voice, Inc., 83 F.3d 1559, 1573, 152 LRRM 2145 (7th Cir. 1996), cert. denied 519 U.S. 1055 (1997); Asseo v. Centro Medico del Turabo, Inc., 900 F.2d 445, 454, 133 LRRM 3090 (1st Cir. 1990); Kaynard v. Palby Lingerie, Inc., 625 F.2d 1047, 1053, 104 LRRM 2897 (2d Cir. 1980); Dunbar v. Northern Lights Enterprises, Inc., 942 F. Supp. 138, 146-147, 153 LRRM 2457 (W.D.N.Y. 1996); D'Amico v. United States Service Industries, Inc., 867 F. Supp. 1075, 1086-87, 146 LRRM 2796 (D. D.C. 1994); NLRB v. Ona Corp., 605 F. Supp. 874, 883-84, 886, 118 LRRM 3257 (N.D. Ala. 1985); Aguayo v. Tomco Carburetor Co., 853 F. 2d 744, 750, 129 LRRM 2086 (9th Cir. 1988); Maram v. Universidad Interamericana de Puerto Rico, 722 F. 2d 953, 959-960, 115 LRRM 2118 (1st Cir. 1983); Blyer v. P & W Electric, Inc., 141 F. Supp. 2d 326, 330-331 (E.D.N.Y. 2001).

[31] See Pye v. Excel Case Ready, 238 F.3d 69, 74-75, 166 LRRM 2333 (1st Cir. 2001) ("absence of key union organizers can contribute to the erosion of support for a nascent union movement"); Kaynard v. Palby Lingerie, Inc., 625 F.2d 1047, 1053, 104 LRRM 2897 (2d Cir. 1980) (discharge of active and open union supporters "risked a serious adverse impact on employee interest in unionization"); NLRB v. Longhorn Transfer Service, Inc., 346 F.2d 1003, 1006, 59 LRRM 2498 (5th Cir. 1965) (discrimination against leading union adherents a principal weapon used to injure irreparably a union's status in a plant).

[32] See "Promises to Keep: Securing Workers' Rights to Self-organization Under the NLRA," 96 Harv. L. Rev. at 1792-93 (studies show significant decline in proportion of discriminatees accepting reinstatement when offered more than six months after discriminatory act), cited with approval in Kobell v. Suburban Lines, 731 F.2d 1076, 1094 and n. 32, 115 LRRM 3297 (3d Cir. 1984). This view has support in other scholarly studies. See Gaines, "The Case for Quick Relief: Use of Section 10(j) of the Labor-Management Relations Act in Discriminatory Discharge Cases", 56 Ind. L. J. 515, 517 n. 13 (1981). Other courts have also relied on a concern to avoid scattering as a basis for 10(j) relief. See NLRB v. Electro-Voice, Inc., 83 F.3d at 1573; Aguayo v. Tomco Carburetor Co., 853 F.2d 744, 749, 129 LRRM 2086 (9th Cir. 1988); Angle v. Sacks, 382 F.2d at 660 ("[t]here may be no effective union spokesman at the plant"). Accord: NLRB v. Longhorn Transfer Service, Inc., 346 F.2d 1003, 1006, 59 LRRM 2498 (5th Cir. 1965) (discrimination against leading union adherents a principal weapon used to injure irreparably a union's status in a plant).

[33] See Silverman v. Reinauer Transportation. Co., 130 LRRM 2505, 2509, 1988 WL 159172, at *5 (S.D.N.Y 1988), affd. mem. 880 F. 2d 1319 (2d Cir. 1989); Blyer v. Domsey Trading Corp., 139 LRRM 2289, 2291, 1991 WL

It is noted that, although Respondent discharged only three employees in a unit of over 400 employees, the discharges affected the entire unit as news of the discharges immediately spread throughout the Respondent's facility.  Significantly, the third discharge was the final straw that led employees to walk off the job on August 9 and to commence engaging in the unfair labor strike, which continues to date.

Moreover, Respondent will not be unduly burdened by an order requiring the interim reinstatement of these three employees, nor those strikers who offer to return unconditionally, as it will have the benefit of these trained and experienced employees while it awaits the issuance of a final Board order.  Interim reinstatement will not restrict Respondent's right in the future to impose lawful discipline upon its employees for poor performance or misconduct.[34]

The circumstances herein threaten irreparable harm to statutory rights before the Board can adjudicate the case, and the Board's final administrative order will thus be an inadequate remedy.  This is exactly what Congress contemplated when it enacted Section 10(j).   Further, Respondent has not demonstrated that the proposed injunction would impose an undue burden, and without an interim order, which requires Respondent to reinstate the discharged employees and reinstate the unfair labor strikers upon their unconditional offer to return to work, displacing, if necessary, any new hires or replacements, Respondent will have been allowed to profit from its own wrongful acts.  Frank Bros. Co. v. NLRB, 321 U.S. 702, 704 (1944). Therefore, an interim remedy is "just and proper".

Section 10(j) relief is necessary in order to prevent the dispersion of the discharged employees and to enable the Union to effectively attempt to organize Respondent's facility.  It is noted that, as time passes, the discharged employees may be required to seek employment in other parts of the country, perhaps even outside of the United States, thereby significantly decreasing the likelihood that the Board's order will effectively restore the status quo ante.  It is clear that, absent injunctive relief, Respondent will have been successful in curtailing the Union's organizing efforts and in denying its employees the free exercise of the rights guaranteed them by Section 7 of the Act.  Dunbar v. Carrier Corp., 66 F. Supp. 2d 346 (N.D.N.Y. 1999).

Lastly, the passage of time from the first unfair labor practice to date does not render 10(j) relief inappropriate.  Respondent's violations commenced in July 2002, continued through August 2002, and resulted in a series of unfair labor practice charges and amendments filed

---

148513, at *3 (E.D.N.Y. 1991); Hirsch v. Trim Lean Meat Products, 479 F. Supp. 1351, 1361 n. 31, 102 LRRM 2950 (D. Del. 1979)

[34] See NLRB v. Electro-Voice, 83 F.3d at 1573; Eisenberg v. Wellington Hall Nursing Home, Inc., 651 F.2d 902, 906, 107 LRRM 2958 (3d. Cir. 1981).

from July 22, to September 25.  Moreover, the courts have recognized that the Board needs time to investigate and deliberate before initiating 10(j) proceedings.  See, Pascarell v. Vibra Screw, supra.; Aguayo v. Tomco Carburetor, 853 F. 2d 744 at 750(9th Cir 1988).  Furthermore, the courts should not deny the protections of Section 10(j) because of any perceived delay on the part of the Board, as the affected employees do not have control over the administrative process.  See Gottfried v. Mayco Plastics, Inc., 472 F. Supp. 1161, 1167-68, 101 LRRM 2815 (E.D. Mich. 1979), aff'd per curiam, 15 F.2d. 1360, 103 LRRM 3104 (6th Cir. 1980).  Injunctive relief remains appropriate in this matter, despite some passage of time, because an interim injunction now would be much more effective to preserve and protect the statutory rights of the affected employees than a Board order in due course issued many more months from now. Arlook v. Lichtenberg, supra. at 374; Pascarell v. Vibra Screw, supra. at 881-882; Gottfried v. Mayco Plastics, supra. at 1167-68.

## IV.  CONCLUSION

For the reasons stated above, injunctive relief under Section 10(j) of the Act is warranted given the clear showing of irreparable harm to employee statutory rights absent an injunction. Congress has made it clear that employees are entitled to be represented by a labor organiation of their choosing.  In this instance, Respondent's actions undermine that congressional intent. Accordingly, it is requested that an interim order issue directing Respondent to cease and desist from its unlawful conduct and to take the affirmative action requested in the Petition.

Dated this 5th day of December, 2002.

ROCHELLE KENTOV, Regional Director
National Labor Relations Board, Region 12
201 East Kennedy Blvd., Suite 530
Tampa, Florida  33602
(813) 228-2641 (telephone)
(813) 228-2874 (facsimile)

MARGARET J. DIAZ, Regional Attorney
Florida Bar #320692

Jennifer Burgess-Solomon, Attorney for Petitioner
Florida Bar #995697
National Labor Relations Board, Region 12
51 S.W. 1st Avenue, Suite 1320
Miami, FL  33130
Telephone: (305) 536-5391
Facsimile: (305) 536-5320

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION
Case No. _____ - Civ

**ROCHELLE KENTOV, Regional Director of the
Twelfth Region of the National Labor Relations Board,
for and on behalf of the NATIONAL LABOR
RELATIONS BOARD,**

Petitioner

v.

**POINT BLANK BODY ARMOR, INC.
and NDL PRODUCTS, INC., a Single Employer,**

Respondent.

_____/

## CERTIFICATION OF SERVICE

I hereby certify that one copy of each of the following documents:
1. Petition for Injunction Under Section 10(j) of the National Labor Relations Act, as amended
2. Petitioner Kentov's Memorandum of Points and Authorities in Support of Petition for Injunction Under Section 10(j) of the National Labor Relations Act, as amended
3. Order to Show Cause

was served by overnight mail on the following named individuals on December 6, 2002.

Joan Canny, Esq.
Stearns Weaver Miller
Weissler Alhadeff & Sitterson, P.A.
150 W. Flagler Street
Miami, Florida  33130

Ira Katz, Esq.
Union of Needletrades, Industrial and
Textile Employees (UNITE!), AFL-CIO
1710 Broadway
New York, N.Y.  10019

Union of Needletrades, Industrial and
Textile Employees, (UNITE!), AFL-CIO
Attn:  Scott Cooper, International Representative
4405 Mall Blvd., Suite 600
Union City, GA  30291

Point Blank Body Armor, Inc.
Attn:  Sandra Hatfield
4031 N.E. 12th Terrace
Oakland Park, FL  33334

NDL Products, Inc.
Attn:  Joseph Giaquinto
4031 N.E. 12th Terrace
Oakland Park, FL  33334

Jennifer Burgess-Solomon, Attorney for Petitioner
National Labor Relations Board, Region 12
51 S.W. 1st Avenue, Suite 1320
Miami, Florida  33130
Florida Bar #: 995697
Telephone (305) 536-5391, Facsimile (305) 536-5391