UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  02-61716-CV-MARRA

ROCHELLE KENTOV, Regional Director of the
Twelfth Region of the National Labor Relations Board,
for and on behalf of the NATIONAL LABOR
RELATIONS BOARD,

Magistrate Judge Seltzer

       Petitioner,

vs.

POINT BLANK BODY ARMOR, INC.,
and NDL PRODUCTS, INC., a Single
Employer,

       Respondent.

_____/

FILED by _____ D. C.

**JAN 3 0 2003**

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. FT. LAUD.

## FINAL JUDGMENT GRANTING PETITION FOR INJUNCTION
## UNDER SECTION 10(j) OF THE NATIONAL LABOR RELATIONS ACT

THIS CAUSE is before the Court upon the Petitioner's Petition for Injunction pursuant to

Section 10(j) of the National Labor Relations Act [DE 1].  The Court has carefully considered all

the filings by the parties, including the administrative record of proceedings before the National

Labor Relations Board, the testimony and argument presented before this Court, as well as the

written and oral closing arguments of the parties, and is otherwise fully advised in the premises.

### I. BACKGROUND

Petitioner, Regional Director of the Twelfth Region of the National Labor Relations Board

("NLRB"), on behalf of the NLRB (hereinafter "NLRB," "Board" or "Petitioner"), seeks an

injunction pursuant to 29 U.S.C. § 160(j) ("Section 10(j) of the Act").  Petitioner seeks to enjoin

Point Blank Body Armor, Inc. and NDL Products, Inc. (hereinafter "Respondent" or "Company")[1]

_____

[1]  Point Blank Body Armor, Inc. and NDL Products are wholly owned subsidiaries of
DHB Industries.  The two companies operate from the same physical plant.  In both the present

pending the final disposition of complaints of unfair labor practices allegedly committed by the Respondent during a union organization campaign beginning in July 2002.  An administrative law judge ("ALJ") is currently considering the NLRB's administrative complaint regarding unfair labor practices.  A two-week hearing before the ALJ concluded on December 13, 2002, and final written arguments were due on January 21, 2003.  Counsel for the NLRB indicated that a decision is not expected from the ALJ until April, May or June of 2003.  Respondent will then have the opportunity to appeal any adverse ruling to the full Board.  Due to the delay inherent in this process, Petitioner seeks injunctive relief from this Court.

In particular, the NLRB is seeking an injunction against Respondent to enjoin it from disciplining or discharging employees because of their union support or activities, threatening to terminate or send workers home because of their union support or activities, telling striking workers participating in an unfair labor practice strike that they have been permanently replaced, and other specified actions allegedly designed to thwart the organization of the union.  In addition, and perhaps most importantly, Petitioner seeks affirmative relief in the form of Court-ordered reinstatement of three terminated employees and any other workers now on strike who make an unconditional offer to return to work.  The requested relief, if granted, may require the displacement of newly hired replacement workers.

This dispute began on Monday, July 15, 2002, when employees of Respondent began to organize.  A representation petition was filed with the NLRB seeking the Union of Needletrades,

---

case and in the underlying administrative proceeding, Petitioner seeks to have the companies considered a single employer.  See ¶ 7(a)-(c) of the Petition.  As will be discussed below, there is sufficient evidence, taken in the light most favorable to Petitioner, to conclude that a rational factfinder might find for the Petitioner on this issue.

Industrial and Textile Employees ("UNITE" or "UNION") to represent them.[2] That same day, and the following day, Respondent's supervisors had meetings with its attorneys about how to respond to the Union campaign. Official Report of Proceedings before the National Labor Relations Board, Testimony of Ronda Graves, at 1360-62.[3] One of Respondent's supervisors, Etalvina "Vina" Martin, approached employee Migdalia Ameneiro on July 15, 2002. Supervisor Martin asked Ameneiro if she signed a paper from the Union, which Ameneiro had done earlier that morning before entering the facility. Testimony of Migdalia Ameneiro, at 553. Supervisor Martin directed Ameneiro not to sign any paper for the Union, and informed the employee that if the company became unionized, it would close down. Id.

On Wednesday, July 17, 2002, over 100 employees attended a union meeting. During that meeting, it was decided that the following day a small group of employees, with the others following behind, would present two documents to Respondent's supervisors during the morning break. One document was for recognition of the Union as their collective-bargaining representative, and the other alternatively sought company neutrality during an election period. Testimony of Sadius Isma, at 158-162; Testimony of Virginia Salazar, at 280-284; General Counsel's Exhibits 10-12. The employees chose Sadius Isma to be their spokesperson while presenting the documents to Respondent's supervisors, since he spoke English better than the others. Salazar at 284. It was also

---

[2] As explained below in the next section, these factual findings are made "taking the evidence in the light most favorable to the Petitioner" under the standard in Arlook v. S. Lichtenberg, 952 F.2d 367, 371 (11th Cir. 1992).

[3] Hereinafter, citations to the administrative record of proceedings before the ALJ will refer to the page number(s) of the administrative record, found at docket entries 28 to 38 in the Court file.

decided that if any of the presenting employees were singled out because of the group activity, the others would protest by chanting. Id. at 385.

On Thursday, July 18, 2002, Sadius Isma, Virginia Salazar and other co-workers left their departments at the 9:40 a.m. break time in order to present the two documents to Respondent. Isma at 72; Salazar at 285; Testimony of Jorge Ramos at 395-397; Ameneiro at 554. Approximately 100 employees followed behind Isma and Salazar chanting "*Si Se Puede*".[4]  Ramos at 398. Rosa Valdes, Executive Assistant to Respondent's Chief Operating Officer Sandra Hatfield, testified that she immediately called 911 because "it looked like a riot, and that something was about to occur." Valdes at 1874. At this point, Ed Lavigne, a management employee, came running toward the executive offices where Valdes sat at her desk, bleeding from his head.[5]  As the employees approached President Hatfield's office, they met Chief Operating Officer (COO) Ronda Graves and Human Resource Manager Juan Dominguez at the office door. Isma, 174-175; Salazar, 285-88; Ramos 397-399. As the documents were handed to these supervisors, Isma explained the purpose of each letter.[6]  Isma, 182; Salazar, 288; Ramos, 397; Graves, 1384. COO Graves said that she would not accept either document and that the employees were doing something illegal. Isma, 182; Graves, 1384. Graves testified that Isma said that, "You made a mistake. It will get bad. It will get worse for you . . . ." Graves interpreted this statement as a threat. Graves, 1384, 1564. The chanting

---

[4] "*Si se puede*" means "yes we can" in Spanish. Ramos, 396.

[5] No one could remember how he got hurt, including Lavigne, but Valdes assumed he had been attacked. The police report later stated that Lavigne hit his head on a door. Testimony of Sgt. Salsberry, 1201-1205, 1221; Lavigne, 1025.

[6] Both Deputy Salsberry's police report and testimony from Rosa Valdes indicate that Salazar was the one telling Graves to sign and was pushing papers in Graves' face, not Isma. Graves, 1546; Valdes, 1873, 1876.

continued. Ameneiro at 555. Dominguez accepted the documents and the group dispersed. Salazar; 293; Ramos, 399-400. When the ten-minute break ended, all of the employees returned to their work stations and began working. Isma, 187; Salazar, 293-294; Ramos, 400-401; Ameneiro, 555; Mencia, 743. Upon return to her work station, union supporter Rosana Mencia was approached by Supervisor Martin, who informed her that if she got up again, she would be sent home. Mencia, 741, 779-781. Martin made similar statements to the others in her department who had been part of the group that approached Graves and Dominguez that morning. Mencia, 781-782.[7]

At around 10:00 a.m., the police arrived at Respondent's facility. Isma, 187-188; Salazar, 294: Ramos, 401. The police officers on the scene confirm, as did Graves, that all was quiet when they arrived and that the employees were back at their work stations.[8] Deputy Salsberry, 1202; Sgt. LeCerra, 1320-1321; Lt. Drago, 1676-1678; Graves, 1385, 1548. The highest-ranking police officer to testify, Lt. Drago, also confirmed that Respondent's supervisors were nervous and that the first job of the police was to try to calm down the supervisors. Lt. Drago, 1640. The police officers met some of Respondent's supervisors in Rosa Valdes' office, including COO Graves, who informed the officers that Respondent wished to evacuate the facility. Lt. Drago, 1642; Sgt. Santalucia, 1707; Graves, 1399-1400. Some supervisors reported that there were "rumors" from unidentified sources

---

[7] On cross-examination, Respondent's counsel attempted to impeach Ms. Mencia as to whether Supervisor Martin told everyone returning from break, not just those that had presented the letter to Graves, about being sent home. Taking the evidence in the light most favorable to the Board, the Court accepts the fact that Martin targeted workers who had supported the union.

[8] Sgt. Santalucia stated that when he arrived at the facility, COO Graves informed him that they had had an earlier problem with employees who were upset with services in the facility and wanted benefits, but that the employees had all gone back to work. Sgt. Santalucia, 1703.

5

that the employees planned on overturning tables at lunchtime.[9]  However, it was admitted that this was speculation.  Giaquinto, 1006-1007; Supervisor Castillo, 1991-1994; Graves, 1553.

The police suggested getting the leaders of the petition presentation, Isma and Salazar, to help with an orderly evacuation.  Graves at 1401.  COO Graves went to get Isma from his work station. Graves, 1401-1404.  She asked him to follow her to the offices, which he did without complaint. Over 100 of his co-workers "stopped and watched" while Isma accompanied Graves.  Graves, 1404. After Isma left the main sewing area, the remaining employees in his area began chanting and singing in protest of his being singled out and removed from the work area, as had been discussed at the union meeting the prior day.[10]  Salazar, 385-386.  Isma was brought to Valdes' office where several police officers and Respondent's representatives were waiting.  Isma, 189-190; Graves, 1405. Meanwhile, Graves then went to get Virginia Salazar to help.  Graves, 1406-1407.  Back at the offices, Isma was directed to tell all of the employees that they had to leave the facility because the employer was closing at 11:00 a.m.  Isma, 191.  After some discussion, Isma declined to take responsibility for directing the employees to leave, but agreed to act as a translator for Respondent.[11] Isma, 192-193.  However, there is no indication that Isma did any translating, and he returned to his co-workers, who continued to chant.  Isma, 193-194.

---

[9]  No vandalism to property or violence ever took place before or during the evacuation. Lt. Drago, 1684-1685; Sgt. Santalucia, 1718; Deputy Salsberry, 1206-1207.

[10]  Graves testified that Isma caused the chants to grow louder by moving his arms in a rising gesture.  However, she also stated that she heard chanting when she was escorting Salazar to the offices where she saw the interaction between Lt. Drago and Isma before Isma ever returned to the main sewing area.  Graves, 1407-1409, 1558.

[11]  Most of the employees speak Spanish or Creole.

Within minutes thereafter, Respondent, via its speaker system, its supervisors and police officers, directed all employees to leave the facility and return the following morning. Salazar, 297; Ramos, 401-402; Ameneiro, 555-556; Mencia, 743-744.[12] The graphic designers and customer service representatives, who were not part of the employee unit petitioned for by the Union, were not required to evacuate, despite the alleged safety concerns. Lavigne, 1077; Power, 1137.

Once outside, the employees continued chanting their slogans.[13] Isma, 200; Ameneiro, 557. The employees were directed to leave Respondent's parking lot. Specifically, Sgt. Le Cerra approached Isma and asked him to help with getting employees out of the company parking lot. Isma complied. Sgt. Le Cerra, 1301, 1324-1325. In fact, this same police officer considered the evacuation like the exiting of spectators at the end of a major sports event. Le Cerra at 1323. Most of Respondent's employees, including Isma, moved to a parking lot of an apartment building across the street from Respondent's facility to protest the unlawful early dismissal. Isma, 200-203; Salazar, 298-299; Ameneiro, 557. Mencia, 746. The police blocked off the street to oncoming traffic and stood directly in front of the protestors on the Point Blank side of the street. Ameneiro, 558; Deputy Salsberry, 1187-1188; Le Cerra, 1323.

When the employees continued to protest and failed to leave the area across from the facility, the police arrested Isma for unlawful assembly in failing to move the protesters off the street. Isma was taken to the police station based on their conclusion that he was the leader of the employees.

_____

[12] The Court notes that the employees were clocked out around 11:00 a.m., and were not paid for the hours normally worked for the remainder of the day. Graves, 1476; Santalucia, 1717-1718.

[13] Lt. Drago testified that Isma's actions did not directly affect the evacuation plan and that the evacuation went smoothly. Lt. Drago, 1652, 1658.

Sgt. Le Cerra, 1306-1308, 1336-1337. Sgt. Le Cerra confirmed that Isma was calm and polite, did not resist arrest, and did not instigate any action by employees when he was placed inside the police vehicle. Sgt. Le Cerra, 1338. Despite the passivity of Isma, other employees surrounded the vehicle and continued to protest after he left the area. Sgt. Le Cerra, 1309. In fact, after arriving at the police station and learning from Isma that the employees were trying to talk to management about improving their working conditions, Sgt. Le Cerra recommended to his supervisors that Isma not be taken to the jail, but rather, be issued a notice to appear. Sgt. Le Cerra, 1311, 1340-1341; RX 19. The notice to appear states that Isma was arrested for the alleged unlawful assembly of over 350 of Respondent's employees. RX 19.

Sgt. Le Cerra then gave Isma a ride, in the front seat of his vehicle, back to the facility. Isma was provided with Sgt. Le Cerra's business card so that Respondent's employees had a police contact number to assist them with future protests. Isma, 208; Sgt. Le Cerra, 1339. Upon their arrival, Graves and Dominguez were waiting for them by the facility gate. Isma, 209; Sgt. Le Cerra, 1312-1313. Graves told Isma that he would be arrested for trespass if he ever set foot on company property again. Dominguez gave Isma a termination letter,[14] and directed him to return his ID badge. Isma complied with this request. Isma, 210; Sgt. Le Cerra, 1343-1344; Graves, 1448.

After being discharged, Isma left the area and went to a union hall where a majority of Respondent's employees had gathered. Isma, 211-215. He explained that he had been arrested and later terminated. Isma, 216.

---

[14] The termination letter states that Isma be was terminated for "violating company policy" for "engaging in threats or conduct threatening to others during working hours or on company premises." GC Exhibit 17.

On Friday, July 19, many employees came to work early and chanted outside of the facility. Ramos, 403. Four police officers were present in the parking lot and eight security guards were present inside the facility all day. Metal detector wands were used to check workers as they entered the facility at the one entrance that Respondent allowed to remain open. Ramos, 403-404; Graves, 1451, 1453. During that day, Respondent announced over the speaker system that all the employees in the various departments had new start time and break time schedules, which no longer overlapped with one another. Stipulation, 92-93; Ameneiro, 559; Roman, 668-669, 688-689; Abreu, 714. It also announced that employees could no longer go to different departments to talk to their co-workers. Ameneiro, 559; Roman, 668, 688. Respondent stopped providing overtime assignments to employees for the period of July 19 through August 9, the day that employees walked out in protest of Midho Cadet's discharge. Stipulation, 92-93. Supervisor Pomalaza testified that overtime was reinstated in September when "the personnel was more calm" and "everything went back to normal." Pomalaza, 1849, 1851.

On or around July 19, 2002, Point Blank's President, Sandra Hatfield, informed Supervisor Zalina Ali, in the presence of employees, that the material that they were working on was to be packed up and shipped to another company for completion. Castillo, 518-519. Supervisor Ali then informed her employees, including Hugo Castillo, of that directive from Hatfield. Castillo, 519-520. When Hugo Castillo asked her for an explanation, Ali said that it was the Union's fault that it was being taken away for completion, and that the company may have to close because of the Union. Castillo, 519-520.

At the end of July, employee Carlos Alejandro Briseno was asked by Supervisor John Jairo Castillo to come to his office. Supervisor Castillo advised Briseno that if he were Briseno he would

remove his union button.[15] Briseno, 458-461. He further stated to Briseno that the company would defend itself, and that if the Company was instigated by the Union, it could close. Briseno, 458-460.

On August 1, employee Briseno finished his shift at 4:00 p.m. and went to the discarded scraps of material, which are ultimately placed in the garbage dumpsters. Briseno, 461. Briseno overtly took scrap material to make pouches for knives that he uses at work to cut material. After doing so, Briseno walked past two supervisors carrying the material. Briseno, 461-462. A number of employees testified that they were unaware of a published rule against taking such material, and they had never been put on notice of such a prohibition. Salazar, 315; Ramos, 412-413; Briseno, 470; Castillo, 521. In fact, numerous witnesses, including Respondent's own witnesses, confirmed that employees and supervisors often wear or use items that are made from material left over after cutting a customer order, such as aprons, pouches, purses, shorts, sweat absorbers, and machine or hand wipes. No disciplinary action was taken against employees for engaging in this activity.[16] Salazar, 317-318; Ramos, 411-413; Briseno, 469-471; Castillo, 521-523; Supervisor Frias, 1773; Supervisor Castillo, 2014-2016, GCX 21.

While Briseno was waiting in his vehicle on the company lot for his wife, a co-worker, Supervisor John Jairo Castillo approached him and asked if he took anything from the company. Briseno, 463. Briseno said yes, and showed him the material. Supervisor Castillo then asked who

---

[15] Around this same time, Supervisor Martin similarly told Mencia to take off her union button and remove her union papers from her work station because President Hatfield would be very upset if she saw them. Mencia, 758-759.

[16] Respondent contends that it has a policy of utilizing left over material that is greater than three inches. Supervisor Castillo, 1946, 1958. This contention is inconsistent with the testimony of its own witnesses who admitted that employees make aprons out of the left over material without being subject to discipline. Frias, 1773; Supervisor Castillo, 2014-2016.

had provided him with permission to take the material.  Briseno, 463.  Supervisor Castillo told

Briseno that he could not take anything from the company.  Briseno responded that it was garbage,

and Supervisor Castillo confiscated the material.  Briseno, 464, 493.  Supervisor Castillo then

returned to Briseno's vehicle with Human Resources ("HR") Manager Dominguez.  Briseno, 464,

493.  Dominguez asked Briseno why he took the material, and Briseno reiterated that it was garbage.

Briseno, 464, 493.  Dominguez told Briseno that he was prohibited from taking from the company,

and Castillo told him that he was fired.[17]  Briseno, 464, 494.  Briseno then asked if he was being

discharged because of his wearing a union button. Briseno, 465, 494.  Supervisor Castillo said no,

and asked him to sign a termination form.  Briseno refused to sign the form, stating that he would

return the following morning.  Briseno, 465.  Supervisor Castillo admits that the form that he asked

Briseno to sign did not have a place for an employee signature, and may actually have been blank

at the time that he asked Briseno to sign it.  Supervisor Castillo, 2028, 2030, GCX 32.  Supervisor

Castillo stated that he told Briseno that "at that moment, the company had zero tolerance and he

would be let go." [18]  Supervisor Castillo, 1964.

The next morning, Briseno went to the HR department.  While there, HR Manager

Dominguez reiterated that Briseno was fired for taking scraps of material out of the garbage and for

being a thief.  Briseno, 467.  HR Manager Dominguez told Briseno that President Hatfield did not

want to see him at the facility again, and he directed Briseno to drop his wife off outside of the

---

[17]  However, the police were not called that day despite the fact that Briseno allegedly
stole from the company. Supervisor Castillo, 2045; Valle, 2215.

[18]  Supervisor Castillo in large part corroborated Briseno's testimony regarding the
discussions that took place at Briseno's vehicle on August 1.  Supervisor Castillo, 1955-1956,
1964-1966.

company's premises. Briseno, 467. When Briseno asked for documentation regarding his discharge and for HR assistant Lorena to translate for him, Dominguez said that there was no need because the company could fire him without giving him any documentation. Briseno, 469. Briseno was then escorted from Respondent's premises by two police officers. Briseno, 469. Supervisor Castillo testified that he gathered and spoke with the employees under his direction on that day because he thought they would think that Briseno was fired because of the Union. Supervisor Castillo, 1968-1969.

Supervisor Kolbeck confirmed that, if all pieces for a customer order are made pursuant to their contracts, the material cannot be used for any other purpose. Supervisor Kolbeck could not confirm that any contracts were ongoing that would have called for the use of the material that was taken by Briseno, who assumed it was garbage. Kolbeck, 2087-2090; Briseno, 476-478.

On August 2, 2002, the same day that Briseno was escorted out of the facility, Respondent sent a letter to employees informing them that the company would not tolerate the "slowdown" activity in which certain employees had been engaged.[19] GCX 19(f). It specifically stated that "the company is making arrangements to transfer work to outside contractors and is making preparations to lay off employees. Employees who engage in the slowdown activity will be selected first for layoff." GCX 19(f). However, Respondent admitted that there was no increase in subcontracting during that time. Graves, 1523. The letter and Briseno's termination were mentioned at the August 7th union meeting when the employees discussed whether they would go out on an unfair labor practice strike if Respondent continued its adverse conduct toward union supporters. Salazar, 366.

---

[19] Supervisor Martin also told employees around this same time that the company might possibly close and move elsewhere. Mencia, 816-817.

On Wednesday, August 7, the Union held a meeting at which over 100 employees were in attendance.  Salazar, 310.  The employees agreed that they would go out on a strike if Respondent continued to engage in unfair labor practices, since the motto was if Respondent were to touch one employee, it would touch all of them.  Salazar, 310, 311, 360; Castillo, 542; Ameneiro, 591-592, 594-599; Roman, 679; Mencia, 818.

On Thursday, August 8, employee Midho Cadet, who had been wearing a union button, returned from a bathroom break to find Supervisor Martin waiting for him with Plant Manager Valle approaching.  Cadet, 609-610; Supervisor Martin, 2138, 2142.  Supervisor Martin informed Plant Manager Valle that Cadet had spent about 10 minutes in the bathroom, which Cadet denied.  Cadet, 610.  Plant Manager Valle directed Cadet to sign a disciplinary action form, to go home and to return the following day.  Cadet, 610-611.  Cadet refused to sign the form, written in English, and was sent home.[20]  Cadet, 611, GCX 33.

This same day, in a different department, Supervisor Frias had a conversation with employee Abreu during a break.  Frias reminded Abreu that she had a union button on, that she was a single mother, that the Union would not do anything for her, and that Frias could get her a salary increase.  Abreu, 719.

On Friday, August 9, after punching in and going to his workstation, Midho Cadet was directed by Plant Manager Valle to follow him.  Cadet, 612.  Valle told Cadet that he was to return his ID badge because he was terminated.  Cadet, 613.  Cadet asked for an explanation and Plant Manager Valle told him it was due to Cadet's refusal to sign the form.  Cadet, 613.  Cadet then asked

---

[20] Valle testified that Cadet asked him if he was being warned because of the Union. Valle, 2191.  Cadet could not understand English well enough to understand the letter.  Cadet, 611, 618.

for a termination letter and was brought to the HR department by HR Manager Dominguez. Cadet, 613-614; Valle, 2200-2201, 2218. Dominguez then informed Cadet, translated through Supervisor Remy, that he was discharged for spending 10 minutes in the bathroom. Cadet, 614. He was not provided with a termination letter at the time, despite his request. Rather, he was told by COO Ronda Graves, who entered the HR Department at the time that Cadet was discharged, that he would receive one in the mail. Cadet, 616. He did receive a termination letter in the mail. However, the letter did not provide any reason for his termination. Valle, 2224; GCX 23.

COO Graves stated that employees are allowed to go to the bathroom anytime they need to and for as long as needed. Graves, 1600-1601; Ramos, 415. Additionally, employee witness Ameneiro testified that Supervisor Martin was disparately treating Midho Cadet, who wore a union button before his suspension and discharge. Ameneiro attested that Supervisor Martin would call and scream at Cadet whenever he got up from his work station to go to the bathroom, drink water or make any movement. Ameneiro, 595-601; Martin, 2138.

Rumors about Cadet's termination immediately circulated through Respondent's facility once he left that morning. In response, approximately 80 to 100 employees walked off the job that day to protest his termination.[21] Ramos, 433-434. In response to the walkout, Respondent's own witness, Juana Zapata, corroborated Petitioner's witness, Marleny Roman, who testified that Supervisor Pomalaza stated that after three days, the strikers would no longer be considered workers of Point Blank, but instead would be fired. Roman, 679, 681; Zapata, 1830.

---

[21] Others did not walk out that day after being informed by Respondent that Cadet left for personal reasons. Joseph, 639-641.

At the end of the day, President Sandra Hatfield thanked the remaining employees for not walking out in protest. Joseph, 642. She stated, through translators Supervisor Guy Louis Remy and Supervisor Juan Valle, that she had "promised you all a raise for two years, and now I will see what I can do." Joseph, 642. At this same time, after some employees complained about the new start times, President Hatfield, and translators Remy and Valle, agreed to change them back. Joseph, 642; Remy, 2167.

On Monday, August 12, the employees continued their strike activity, which had begun on Friday, August 9 as a result of Cadet's discharge. The strike continues to date. Roman, 667; Mencia, 738. Respondent continues to maintain a presence of security guards and BSO officers at its facility. Giaquinto, 985; Officer Cox, 1258-1259, 1271; Graves, 1513.

On August 28, Respondent sent the employees a letter informing them that the strikers have been "permanently replaced" and that they no longer have jobs. GCX 19(i). The letter further stated that, if any of the strikers wished to return to work, they would be placed on a "preferential recall list." If there are any job openings in the future, Respondent indicated it will "consider" the individuals on the list for those openings before other applicants. GCX 19(i). A notice to employees stating the same thing, in all three languages, remains on Respondent's fence facing the strikers. Salazar, 314; Ramos, 420; Mencia, 767-768; GCX 20.

## II. DISCUSSION

The United States Court of Appeals for the Eleventh Circuit has set forth the duty of a district court in hearing a Section 10(j) injunction petition. The district court "should grant the Board's request for § 10(j) equitable relief only when (1) there is reasonable cause to believe that the alleged unfair labor practices have occurred, and (2) the requested injunctive relief is 'just and proper.'"

15

Arlook v. S. Lichtenberg & Company, Inc., 952 F.2d 367, 371 (11th Cir. 1992), *citing* Boire v. Pilot Freight, 515 F.2d 1185, 1188-89 (5th Cir. 1975).[22]

### A. Reasonable Cause

In determining whether reasonable cause exists, "the Board must present enough evidence in support of its coherent legal theory to permit a rational factfinder, considering the evidence in the light most favorable to the Board, to rule in favor of the Board." Arlook, 952 F.2d at 371. A district court is expressly prohibited from weighing all the evidence presented to it, in an effort to decide, whether or not, in fact, the employer engaged in unfair labor practices. Id. at 372. The ultimate determination of whether there have been unfair labor practices is for the NLRB. Id. at 372-373. If the evidence presented, taken in the light most favorable to the Board, permits the conclusion that "a rational factfinder *might eventually rule in favor of the Board,*" then reasonable cause has been established under 10(j). Id. at 373 (emphasis in the original).

The Board's theory in this case is that Respondent interfered with, restrained, or coerced their employees in the exercise of the workers' rights to form a union in violation of 29 U.S.C. § 158(a)(1). The wrongful conduct was manifested by changing employees' schedules, denying employees overtime, closing the plant early the first day of union activity, and threatening to close the facility if the workers unionized. The Board also asserts that Respondent violated 29 U.S.C. § 158(a)(3) ("discrimination in regard to employment or any term or condition of employment to

---

[22] The decisions of the United States Court of Appeals for the Fifth Circuit, as that court existed on September 30, 1981, handed down by that court prior to the close of business on that date, shall be binding as precedent in the Eleventh Circuit, for this court, the district courts, and the bankruptcy courts in the circuit. Bonner v. Pritchard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

encourage or discourage membership") by terminating three union supporters because of their union leadership or support, in addition to the alleged violations previously mentioned.

## 1. Single Employer

As previously discussed,[23] the Board seeks to have Point Blank Body Armor, Inc. and NDL Products, Inc. considered as a single employer. The Regional Director has placed in evidence its administrative decision that these two companies should be considered a single employer.

The controlling criteria for determining whether a single employer relationship exists are "interrelation of operations, common management, centralized control of labor relations and common ownership." Radio and Television Broadcast Technicians Local Union 1264 v. Broadcast Service of Mobile, Inc., 380 U.S. 255, 256 (1965). There is no dispute that Point Blank and NDL have common ownership. As to common management, the administrative decision explains that 67% of NDL's sewing workforce is supervised by Point Blank supervisors, and that NDL warehouse and sewing employees often work overtime under Point Blank supervisors. Though each company has separate managers, there is substantial common supervision.

This use of NDL employees to manufacture Point Blank products also indicates an interrelation of operations. NDL employees have been involuntarily transferred to work for Point Blank on either a temporary or permanent basis. The Trade Show Coordinator who works for Point Blank coordinates trade show displays for both companies. Finally, NDL employees who voluntarily transfer from NDL to Point Blank do so without loss of seniority or benefits. These facts constitute at least reasonable cause to believe that Respondent has interrelated operations.

---

[23] See footnote1 at page 1.

17

The last factor is centralized control of labor relations.  Here, the Point Blank Human Resource Department also handles NDL employees, both NDL and Point Blank employees are governed by their parent company's employee handbook, and both sets of employees receive paychecks from Point Blank.

This Court concludes that the Board has shown sufficient evidence in support of its coherent legal theory to permit a rational factfinder, considering the evidence in the light most favorable to the Board, to rule in favor of the Board on the single-employer issue.

### 2.  Termination of Union Supporters

As previously discussed, the Court is to consider the record evidence in the light most favorable to the Board under the Arlook standard.  Thus, this Court does not decide factual disputes, of which there are many in the record of this case.  Applying that standard, the Court finds that a rational factfinder might eventually conclude that union leader Sadius Isma was terminated on July 18, 2002 for union organizing activities, namely, leading the union supporters in presenting to Ronda Graves a petition for recognition of the union by the company, and leading union supporters in chanting slogans.  The swiftness of the decision to terminate Isma (even before his arrest for not assisting in moving union supporters off the street) raises a serious question of pretext in the Respondent's stated reason for termination.  In addition, inconsistencies in Graves' testimony about the "threat" she thought she heard from Isma, as well as the fact that no violence or property damages ever occurred the day of the beginning of the protest, leads this Court to conclude that there is sufficient evidence to conclude that the firing was done to chill Union activity.[24]

---

[24] Graves testified that she felt threatened by Isma's statement to her.  However, even if interpreted as a threat, under the Arlook standard of viewing the facts in the light most favorable to the Board, such a "threat" is not significant enough to justify termination of an employee

18

The Court next considers the alleged unlawful act of Respondent relating to the termination of Carlos Briseno on August 1, 2002, for taking company material to his car. Here again, taking the evidence in the light most favorable to the Board, this Court concludes that a rational factfinder might conclude that his union support is what prompted his termination. The testimony of Juan J. Castillo, a company manager, indicates that when confronted at his car with possession of the material, Briseno immediately returned it, indicating that he thought it was garbage. Employees often took scrap material that was to be discarded to make items for personal use on the job, such as knife holders, aprons, and other work-related items, without being disciplined. Briseno's summary termination for taking such material suggests a discriminatory application of a purportedly new policy of "zero tolerance" for taking material of a certain size. Testimony of Castillo at 1964. See NLRB v. Big Three Industrial Gas & Equipment Co., 579 F. 2d 304, 312-313, (5th Cir. 1978), *cert. denied,* 440 U.S. 960 (1979) (disparate enforcement of employer's policy is unlawful).

The Court reaches a similar conclusion regarding the termination of union supporter Midho Cadet on August 9, 2002. Once again, taking the evidence in the light most favorable to the Board, a rational factfinder might eventually conclude that his termination was a violation of Section 158(a)(1) and (a)(3). Though Respondent argues that Cadet was terminated for insubordination for refusing to sign a disciplinary action form, a reasonable inference to the contrary can be drawn. Cadet had a confrontation about the union with his supervisor just a few days before the bathroom

---

engaged in the exercise of protected labor rights.

19

incident. Taking the evidence in the light most favorable to the Board, in each case of termination, the Board has shown reasonable cause to believe that unfair labor practices have occurred.[25]

### 3. Interference, Coercion or Restraint of Rights

The Board has also presented a valid legal theory and sufficient evidence for a rational factfinder to conclude that Respondent's closing of the plant on July 18, 2002 was an unfair labor practice taken in response to a lawful presentation of a unionization related petition from the workers. The workers who were sent home that day were not paid after 11:30 a.m. Additionally, workers who were not included in the representation petition filed by the union were allowed to remain on the premises. Whether the closing was a simple overreaction by company managers and its attorneys present that day, or whether it was a concerted decision to break immediately the union at its inception, the Petitioner has presented sufficient evidence to demonstrate that the Board might eventually rule that the plant shutdown was an unfair labor practice in violation of Section 158(a)(1).

Furthermore, ending overtime and changing break schedules can also be viewed as coercion and interference with the attempt to unionize. The company's assertion that ending overtime and changing break schedules were a result of security concerns or lack of work may ultimately prove to be valid. As previously stated, however, this Court's duty is limited to viewing the evidence in the light most favorable to the Board. In such light, the nexus between the attempt to unionize and the ending of overtime and the changing of break schedules leads this Court to find that the

---

[25] See NLRB v. Big Three Industrial Gas & Equipment Co., supra, p.19 (disparate enforcement of employer's policy is unlawful); NLRB v. Eastern Massachusetts Street Railway Co., 235 F.2d 700, 709-710 (1st Cir.), cert. denied, 352 U.S. 951 (1956) (minor offense used as pretext for punishment for engaging in protected activity).

Petitioner has presented sufficient evidence to conclude the Board might eventually find these actions are unfair labor practices in violation of Section 158(a)(1).

Finally, the evidence indicating statements made by managers directly to workers, or made within the workers' hearing, that the plant would close if unionization occurs, is sufficient to meet the standard required for a reasonable cause determination that these acts constitute unfair labor practices in violation of Section 158(a)(1).

### B. Just and Proper

Having concluded that the Board has shown reasonable cause to believe unfair labor practices have occurred, the Court turns to the issue of equitable necessity of injunctive relief under the just and proper standard.   Section 10(j) of the NLRA authorizes the district court to grant temporary relief or a restraining order as it deems "just and proper."  Injunctive relief is "just and proper" when the "facts demonstrate that, without such relief, any final order of the Board will be meaningless or so devoid of force that the remedial purposes of the NLRA will be frustrated." Arlook, 952 F.2d at 372, citing Pilot Freight, 515 F.2d at 1192.  The Court notes that the case law is not clear as to whether the traditional four-part test for issuance of preliminary injunctions applies to Section 10(j) injunctions.[26]  The traditional test is not mentioned in Arlook.  In Pilot Freight, the Fifth Circuit did not apply the factors, stating that "though traditional rules of equity may not control the proper scope of § 10(j) relief, some measure of equitable principles come into play."  515 F.2d at 1192-93.  An

---

[26]  The traditional elements are: (1) a substantial likelihood that the plaintiffs will prevail on the merits; (2) a substantial threat that plaintiffs will suffer irreparable injury if the injunction is not granted; (3) the threatened injury to plaintiff outweighs the threatened harm the injunction may do to the defendant; and (4) granting the preliminary injunction will not disserve the public interest.  McDonald's Corp. v. Roberts, 147 F.3d 1301, 1306 (11th Cir. 1998).

analysis of the relevant cases leads this Court to conclude that strict application of the traditional four part analysis for preliminary injunctive relief is not appropriate.

The first element that must be demonstrated by a party seeking a preliminary injunction under the traditional analysis is a likelihood of success on the merits. McDonald's Corp., 147 F.3d at 1306. In order for a court to make such a finding, an evaluation of the merits of the respective claims is required. Although the merits determination is not binding for purposes of considering of the entry of a permanent injunction,[27] factual findings on the merits is necessarily involved.

In the context of § 10(j) injunctions, district courts are prohibited from making factual determinations on the merits of the underlying factual disputes. The district courts must view the evidence presented by the Board in a light most favorable to it. Thus, it is legally and logically inconsistent for the district courts to be directed to refrain from a merits analysis when considering the "reasonable cause" element of § 10(j) injunctions, and then expecting the district courts to make merits determinations when considering the "just and proper" element. It is this Court's belief that, as a result of this inherent inconsistency, the appellate courts have taken the position that "traditional rules of equity may not control the proper scope of § 10(j) relief," Pilot Freight Carriers, Inc., 515 F.2d at 1192 and have not "delineate[d] an entire list of factors" which might justify a finding of equitable necessity. Arlook, 952 F.2d at 372.

Although the appellate courts have not provided a definitive set of guidelines for the district courts to follow in determining whether the granting of a § 10(j) injunction is "just and proper," they have declared that such relief is warranted "whenever the facts demonstrate that, without such relief,

---

[27] University of Texas v. Camenisch, 451 U.S. 390, 395 (1981); McArthur v. Firestone, 817 F.2d 1548, 1552 (11th Cir. 1987).

'any final order of the Board will be meaningless or so devoid of force that the remedial purposes of the [NLRA] will be frustrated.'" Pilot Freight, 515 F.2d at 1192. Hence, § 10(j) relief becomes just and proper "when organizational efforts are highly susceptible to being extinguished by unfair labor practices, when unions and employees have already suffered substantial damage from probable labor violations, and when the violations reasonably found to have been committed will be repeated absent an injunction." Arlook, 952 F.2d at 372.[28]  Although not mandatory, consideration of the traditional elements for the granting of preliminary injunctive relief, other than likelihood of success on the merits, is permissible under Pilot Freight and Arlook.

Based upon the record evidence in this case, the Court concludes that the union efforts are highly susceptible to being extinguished because the organizational efforts had just begun.  In Arlook, the Eleventh Circuit stated that: "[t]he Union was only recently certified by the Board and the employees were bargaining for their first contract.  These two facts make bargaining units highly susceptible to management misconduct." 952 F.2d at 373.  Here, Respondent's employees have not even received certification, as the Union exercised its right to delay a vote of unionization by employees until after the unfair labor practice proceeding is resolved.  Summary termination of Sadius Isma, the employee acting as union spokesperson on July 18, 2002, sent an immediate and clear signal of company intolerance to the union.  The changing of break schedules on July 19, 2002, immediately limited employee interaction beyond neighboring work units, further hindering

---

[28] The court's use of the terms "probable labor violations" and "violations reasonably found" in the Arlook decision reinforces this Court's conclusion that a definitive merits determination is inappropriate when the district courts are to consider the "just and proper" element under § 10(j).  These terms suggest that district courts should rely upon their conclusions regarding the "reasonable cause" element to satisfy the factual findings necessary for a "just and proper" analysis.

organizational activities.  Though Respondent argues that such measures were all done in the name of "security" of the workplace, taking the evidence in the light most favorable to the Board, such measures were done to thwart unionization at the very beginning of such efforts.

The Court also concludes that the Union and employees have already suffered substantial damage from probable labor violations.  As previously discussed, three employees have been terminated, probably in retaliation for their union activities or support.  All striking employees have been terminated and replaced, leading a reasonable worker to conclude that the Union has failed thus far in its attempts to unionize Respondent's facility.[29]  A reasonable worker would also conclude that additional support for the union will result in further reprisals.  Failure to impose an injunction will likely lead to dissipation of union support over the time needed for the Board to complete its administrative process, as striking workers look to find other employment.

Finally, as to whether violations will be repeated absent an injunction, the Respondent's actions indicate that the "violations reasonably found" will continue.  Respondent has terminated all striking employees and  hired replacement workers who presumably are aware of the prior failed attempt to unionize the facility.  Respondent continues to have trespass signs in place and maintains security guards and off-duty sheriff's deputies at its facility.  Based upon the record before the Court, if the current workers  did attempt to unionize absent an injunction, it is likely that the Respondent would take the same actions it has taken to date.[30]

---

[29] Because many workers began what they contend is an unfair labor practices strike on August 9, 2002, and are no longer working in the facility, the Board is unable to produce the same evidence of chilling of union support as made in Arlook.  See Arlook, 952 F.2d at 373.

[30] Respondent might argue that such repetition would occur because everything it did was legal.  While that may ultimately prove to be true, on the record before the Court taken in light of the Arlook standard, the Board has put forth sufficient evidence to show that the Respondent's

Respondent argues that the delay of four months from the last firing to the filing by the Regional Director of the Section 10(j) petition shows that the granting of an injunction cannot be "just and proper." Respondent relies upon Pilot Freight for this contention. Respondent reads too much into the Pilot Freight decision. The Fifth Circuit upheld the denial of the reinstatement remedy where the Board waited three months from discharge before petitioning the district court for interim relief. Pilot Freight, 515 F.2d at 1193. In the case at bar, the Board "waited" four months after the third employee was terminated until the filing of the petition.[31] However, the Fifth Circuit then stated that "[a]lthough the time span between commission of the alleged unfair labor practice and filing for § 10(j) sanctions is not determinative of whether relief should be granted, it is some evidence that the detrimental effects of the discharges have already taken their toll on the organizational drive." Id. The Eleventh Circuit explicitly follows this analysis. Arlook, 952 F.2d at 374. In this case, the Court does not find that the delay from discharge to filing is determinative of whether relief should be granted. Under the circumstances of the series of unfair labor practices filed with the Board by the Union in this case, the timing of the Regional Director's filing of the petition in this case was sufficiently timely.

Based upon the evidentiary record and the reasonable cause determination previously articulated, the Court concludes that irreparable harm will be suffered if injunctive relief is not granted. In this case, it is clear that the delay has not completely weakened the Union, since former

actions were unfair labor practice violations.

[31] The Board explains that the initial complaint made regarding the July 18, 2002 termination of Isma was amended in late August and in early September to incorporate Respondent's actions in August. The Regional Director then sought Board approval on October 24, 2002 to file the petition. That approval was granted by the General Counsel on November 26, 2002. The petition was filed in this Court on December 6, 2002.

employees continue to picket the facility.  It is also clear that a final decision in the administrative proceeding will not occur for many months, if not a year from now.  Having to wait for that period of time will certainly erode, if not destroy, union support.  Therefore, under Arlook, the Board has shown that relief pursuant to Section 10(j) will be much more effective than waiting for a final Board order.

Respondent argues that the recent decision in Johnson v. Sunshine Piping, Inc., – F.Supp.2d –, 2002 WL 31931931 (Dec. 26, 2002, N.D.Fla.) supports its position that no injunction should issue.  However, significant factual distinctions exist between this case and the Sunshine Piping case.  The court in Sunshine Piping found that one of the three alleged terminated union activists was reinstated and the other two had poor performance and attendance records.  The court also found that the company workforce had been reduced from 68 employees at the time the union campaign started in March 2002, to only 35 in November, 2002.  Id. at *5.  Furthermore, the ALJ had already ruled on the Board's administrative complaint.  Id. at *6.  On these grounds, the court concluded that it would not be just and proper to order reinstatement or grant any affirmative relief.  In this case, none of the facts relied upon by the court in Sunshine Piping is present.

In balancing the equities, the Court must weigh the threatened harm of effectively extinguishing the employees' rights to organize under the NLRA, as compared to the possible displacement of replacement workers hired by Respondent.  These replacement workers must have been aware of the existence of the strike prior to beginning employment.  Therefore, they took their jobs with at least constructive notice of the possibility that the strikers could return.  Moreover, COO Graves testified that the replacement workers will be provided permanent jobs regardless of the court's decisions on reinstatement.  Graves, 1619.  As for alleged safety concerns at the plant,

including Respondent's argument that it is the "sole supplier" of body armor to the United States military in this time of potential overseas conflict, its argument is mere speculation.  There is no evidence of violence at Respondent's plants by union supporters, or evidence that having the strikers reinstated would adversely affect Respondent's productivity.  Furthermore, Respondent failed to demonstrate inappropriate union conduct, i.e. interfering wrongfully with Respondent's contractual relations, which would justify a denial of injunctive relief.[32]  Therefore, the Court concludes that upon the record as a whole, the threatened injury to the rights of Respondent's employees outweighs the threatened harm the injunction may cause Respondent.

Finally, the Court concludes that granting the injunction will not disserve the public interest.  At stake in this case are the statutory rights of several hundred employees to organize and then bargain collectively.  Actions by Respondent have chilled those rights to the point where failure to reinstate the status quo as it existed on July 15, 2002 will effectively eliminate the remedial purposes of the NLRA.  The Court therefore concludes that granting the Board's petition for injunction is just and proper under the circumstances of this case.

---

[32] The Court sustains Petitioner's objection to the affidavits offered by Respondent to support alleged wrongful conduct by the union and its supporters.  Respondent's Exhibit 3 for identification from January 9, 2003 hearing and affidavit of Juan Valle, transcript at docket entry 52.  The record in this case consists primarily of the NLRB administrative record.  The Court established a procedure for the parties to submit evidence in addition to that contained in the administrative record.  If additional evidence was to be offered, the offering party was to submit "affidavits which would be in the nature of proposed direct examination."  Oral ruling on December 16, 2002, see minutes at DE 21.  If the proffered evidence was to be admitted, an additional hearing would be held "limited to cross-examination....based on the affidavits submitted."  Thus, any additional direct testimony was to be presented by affidavit, subject to cross-examination at the hearing.  The affidavits offered by Respondent in its Exhibit 3 were not presented as part of the proffer of proposed direct testimony.  See Proffer of Respondent at DE 41.  Rather, they were attached as exhibits to a proffer relating to the testimony of Scott Cooper, the union representative.  The affiants were never produced at the hearing for cross-examination.  As a result, the affidavits are inadmissible hearsay.

### III. CONCLUSION

For the reasons stated above, the Court will enter an injunction as described below. Accordingly, it is **ORDERED** AND **ADJUDGED** as follows:

1.      The Petition for Injunction pursuant to Section 10(j) of the National Labor Relations Act [DE 1] is hereby **GRANTED**;

2.      Respondent, or its officers, agents, representatives, servants, employees, and all members and person acting in concert with it, pending the final disposition of the matters involved pending before the Board, is hereby enjoined from: (1) disciplining, terminating or otherwise adversely affecting the conditions of employment of its employees because of their union support and activities; (2) giving better benefits or working conditions to its employees, or expressly or impliedly offering inducements of better working conditions and benefits to its employees, for withdrawing support or for refusing to support unionization of its manufacturing facility; and (3) interfering with, restraining or coercing its employees in the exercise of their rights under 29 U.S.C. § 157;

3.      Additionally, Respondent, or its officers, agents, representatives, servants, employees, and all members and person acting in concert with it, pending the final disposition of the matters involved pending before the Board are ordered to:

(1) Reinstate discharged employees Sadius Isma, Carlos Alejandro Briseno, and Midho Cadet, displacing if necessary, any newly hired or transferred workers who replaced them, by February 7, 2003; (2) reinstate striking workers who  make unconditional offers to return to work, displacing if necessary, any newly hired or

transferred workers who replaced them, by February 7, 2003; and (3) post copies of the district court's opinion and order at its facility and office in Oakland Park, Florida in all locations where Employer notices to unit employees are customarily posted, and maintain these postings during the Board's administrative proceeding free from all obstructions and defacement;

4. Petitioner's Motion for publication of the Court's Order denying respondent's motion to dismiss [DE 53] is hereby **DENIED, without prejudice** to renew the request if after any Court of Appeals' decision on the instant injunction order, such publication will still be relevant.

5. The Clerk may close this case.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this 30ᵗʰ day of January, 2003.

_____
KENNETH A. MARRA
United States District Judge

Copies furnished via fax to:

Jennifer Burgess-Solomon, Esq.
Fax: (305) 536-5320

Joan Canny, Esq.
Fax: (305) 789-3395

Ira Katz, Esq.
Fax: (212) 307-6904

29